[Civ. No. 10432. Third Dist. Mar. 29, 1963.]

CHARLES H. BROWN, Plaintiff and Appellant, v. ALAN CRANSTON, as State Controller, Defendant and Respondent.

William A. Lahanier, Kolts & Kolts and Chauncey G. Kolts for Plaintiff and Appellant.

Stanley Mosk, Attorney General, and Willard A. Shank, Deputy Attorney General, for Defendant and Respondent.

SCHOTTKY, J.—Charles H. Brown, a former inheritance tax appraiser, brought this action in mandamus to compel the controller to approve three claims for compensation submitted by petitioner under the provisions of section 14772 of the Revenue and Taxation Code. Judgment in the trial court was entered in favor of the Controller of the State of California and Brown has appealed.

This action involved three specific claims. The first concerns the estate of Edith N. Thatcher. Her will was admitted to probate on October 24, 1952. Brown was appointed inheritance tax appraiser, and on September 7, 1954, he filed his report which disclosed a tax due the state in the sum of $804,342.70. Brown then filed a claim with the controller for $1,000 for his services, which claim was never approved. On July 29, 1959, the claim was submitted to and approved by the superior court and then resubmitted to the controller who refused to approve it.

The second claim arose from work done in the estate of Bernice A. Jordan and was submitted within two months

after February 10, 1958, and again no action was taken by the controller. This claim was approved by the superior court on July 29, 1959, and resubmitted to the controller who refused to approve it.

The third claim arose out of work done in connection with the estate of Edith Marian Simmons. This claim was submitted to the controller within two months after May 8, 1959, and was not approved. It was approved by the superior court and resubmitted to the controller who refused to approve the claim.

An inheritance tax appraiser receives compensation pursuant to section 609 of the Probate Code and section 14772 of the Revenue and Taxation Code. This latter section reads in part:

"*Compensation of appraiser and payment of same.* For the services performed by him pursuant to this part, the inheritance tax appraiser shall be paid out of the inheritance tax money in the hands of the treasurer of the county in which he acts:

"(a) *Amount to be fixed by court.* Such reasonable compensation as the superior court of the county, or a judge of that court, shall fix.

" . . . . . . . . . . . .

"*Approval of claim by Controller.* No payment shall be made unless the claim for payment is first approved by the Controller.

"Any payment under this section is in addition to any other payment to the appraiser pursuant to Section 609 of the Probate Code."

At the conclusion of each probate case the appraiser submits to the controller a claim for compensation on a form prepared by the controller.

Before 1920 the controller and the courts adopted a schedule of compensation to be applied in each individual inheritance tax appraisal based upon the value of the estate.

Commencing, however, before 1920 the then controller imposed a limitation of $3,000 per inheritance tax fiscal year upon the amount which any inheritance tax appraiser could receive, regardless of the number and amount of claims submitted. This amount was later raised to $3,200 in about 1928 or 1929. In a few instances the controller would approve more than the $3,200 in claims for an appraiser in any one year, but this occurrence was apparently a rarity. At the same time the limitation was imposed the controller instituted

the procedure whereby the inheritance tax appraisers would send all their claims for compensation to the controller's office. The controller would approve and return only claims in the approximate amount of $3,000 to the appraiser. The appraiser would then submit the approved claims to the superior court, which in turn would approve the claims, and the county treasurer would then issue a warrant on inheritance tax moneys in his possession to the appraiser. Originally the practice in the controller's office was to approve claims as they were submitted by each appraiser until the amount of approved claims reached the sum of $3,000 and return each claim upon approval. Later this practice was changed so that claims were accumulated for a quarter, and thus claims in the amount of $800 were approved at one time and a list of the approved claims was returned to the appraiser for submission to the court. This change apparently occurred as a convenience to all concerned.

The remainder of the unapproved claims for each appraiser was allowed to accumulate until the number became burdensome and a policy of destroying all unapproved claims older than two years was instituted by the then controller.

So the procedure that evolved after about 1920 in the controller's office, and which was in effect at the time appellant was removed from the Los Angeles County panel of inheritance tax appraisers in 1959 by the respondent controller, was essentially as follows: Inheritance tax appraisers submitted all claims for compensation for inheritance tax determinations to the controller. The controller accumulated a file for each appraiser of the unapproved claims. At the end of each quarter of the inheritance tax fiscal year approximately $800 worth of such claims, or as many claims as an appraiser had submitted, assuming the total sum did not reach $800 were approved. The approved claims were returned to the appraiser and were then submitted by the individual appraisers to their respective courts for approval and then to the respective county treasurers for payment. After two years all unapproved claims in the file of a particular appraiser were destroyed.

In the instant case the appellant chose three claims in his own files which had not been approved by the controller and were in excess of the $3,200 limitation, obtained their approval by the Superior Court of Los Angeles County, resubmitted the claims to the controller and brought mandate to compel their approval under section 14772.

The trial court denied appellant recovery on all three claims included within the petition for writ of mandate.

With respect to the claim in the estate of Edith N. Thatcher, the court found it was barred by the statute of limitations contained in section 338 of the Code of Civil Procedure, in that appellant failed to bring an action on the claim within three years after the superior court made its order fixing the inheritance tax due the State of California.

The court also found "that petitioner intentionally, deliberately, and wilfully failed to make any claim for compensation in excess of maximum compensation approved by the Controller of $3200 per inheritance tax fiscal year during any of the years in which petitioner was appointed as an inheritance tax appraiser of the State of California for the County of Los Angeles and thereby voluntarily relinquished all rights to any compensation whatsoever to which he might have been entitled as a result of the discharge of his responsibility as an inheritance tax appraiser in the estates of Edith N. Thatcher, Bernice A. Jordan, and Edith Marian Simmons, or any of them."

The court also made the following conclusion of law: "That by petitioner's intentional, deliberate and wilful failure to make any claim for compensation in excess of maximum compensation approved by the Controller of $3200 per inheritance tax fiscal year during any of the years in which petitioner was appointed as an inheritance tax appraiser of the State of California for the County of Los Angeles constituted a complete and total waiver of all rights to any compensation whatsoever to which he might have been entitled as a result of the discharge of his responsibility as an inheritance tax appraiser."

Appellant makes a number of contentions, principal among which are (1) that waiver cannot be found under the facts of this case; (2) that the statute of limitations has not run upon the claim filed on the Thatcher estate; and (3) that the authority of the controller under section 14772 is purely ministerial, that he merely performs an auditing function and has no authority or discretion to limit the amount of compensation earned by inheritance tax appraisers but that such authority resides in the superior court alone.

Before discussing these contentions, we think it well to discuss briefly the legislative history of the Inheritance Tax Law. In 1913 the Legislature created an Inheritance Tax Department to operate under the control and direction of the con-

troller. The purpose of the department is stated in the law (Stats. 1913, ch. 594, § 1, p. 1055) : "The controller shall maintain under his authority and direction a department, to be known as the inheritance tax department, which is hereby established, for the purpose of supervising and assisting in the administration of the inheritance or transfer tax laws of this state. ..."

Prior to this time the controller had authority to appoint an inheritance tax deputy (Stats. 1909, ch. 337, p. 557), but with the addition of duties more were needed.

In 1917 (ch. 589, p. 880) another Inheritance Tax Law was adopted with a very important change in the language of section 14 *re* compensation of inheritance tax appraisers as follows: "The state controller shall appoint, and may at his pleasure remove, one or more persons in each county of the state to act as inheritance tax appraisers therein. Every such inheritance tax appraiser (in addition to any fees paid him as appraiser under section one thousand four hundred and forty-four of the Code of Civil Procedure) shall be paid for his services out of any inheritance tax moneys in the hands of the treasurer of the county in which he may be acting, a reasonable compensation, to be fixed by the superior court of said county, or a judge thereof, and, together with said compensation, said appraiser shall be allowed his actual and necessary traveling and other incidental expenses, and the fees paid such witnesses as he shall subpoena before him, said expenses and fees to be allowed by said superior court or a judge thereof, *provided,* that any claim for any such services or expenditure, must before payment, first receive the approval of the state controller; ..."

It is at this point that the provisions now present in section 14772 entered the law.

The last change in the fee structure which should be noted occurred in 1933 when the Legislature amended section 609 of the Probate Code (previously Code Civ. Proc., § 1444) to increase the fees of an appraiser of an estate in probate (which until then was not more than $5 a day for each estate appraised) to a statutory formula which reads as follows (Stats. 1933, ch. 283, § 1, p. 852) :

"Each appraiser shall receive from each estate appraised by him as compensation for his services commissions upon the total amount of the inventory and appraisement and supplemental inventory and appraisement as follows: For the first $5,000 or fraction thereof, a fee of five dollars; for the next

$495,000 a fee [of] one-tenth of one per cent thereof; for all over $500,000 a fee of one-twentieth of one per cent thereof. In addition to the fee herein provided each appraiser is entitled to receive his actual and necessary expenses, to be allowed by the court; and he must file, with the inventory, a verified account of his disbursements.''

The present ''Inheritance Tax Law'' (§ 13301) consists of part 8 of division 2 of the Revenue and Taxation Code, comprising section 13301 et seq. Throughout the law the controller is given duties and responsibilities in connection with the administration of the system. Chapter 13 of part 8 provides for the Inheritance Tax Department, and section 14732 states the purpose in the same terms as the original language in the act of 1913: ''The State Controller shall maintain the department under his authority and direction for the purpose of supervising and assisting in the administration of this part and of Part 9 of this division.''

The trial court denied recovery on the ground of waiver. Appellant contends that waiver cannot be found under the facts of this case and that waiver cannot be considered because it was not pleaded. We do not agree.

██ The record shows that in respondent's return to the petition for a writ of mandate it was alleged that the petitioner had acquiesced in the procedure followed by the controller in paying only $3,200 per inheritance tax year. This is a sufficient pleading, since it is sufficient if the facts constituting a waiver are set forth. (*Estrada* v. *Queen Ins. Co.*, 107 Cal.App. 504 [290 P. 525].) ██ But even if the pleading were insufficient to raise the issue of a waiver, the court could still find on the issue. An appellant may not complain that a waiver was not pleaded where evidence relating to such an issue was received without objection and the trial court made a finding on it. (*Townsend* v. *Allen*, 114 Cal. App.2d 291, 299 [250 P.2d 292].) ██ The evidence to support the finding of waiver is that appellant acquiesced in the procedure during his 17-year term as a tax appraiser. He never contacted the controller during his term as to what disposition was to be made of claims which were not approved.

The following statements and conclusions in the trial court's memorandum opinion are fully supported by the record: ''Consider, however, claimant's position. He was undertaking work within his county for the State Controller—an elective officer who appointed him and who was his superior, i.e., to whom he owed his official life. He was a part of a

system which even when he was appointed (1942) was well established, honorable and publicly important, as well as remunerative. It would have taken an audacious person, indeed, who would have told his employer that he intended to handle his claims in a manner different to that in which he was instructed and different from the way every other appraiser was handling them—in short, if he had taken issue with his employer as to the long established practice. Moreover, before he had proceeded very far in his career as appraiser (he placed it at two or three years after becoming a member of the panel—which would check with the witness Moore's statement that such an occurrence took place about 1945) he learned from older associates (who had but recently talked to the Controller) that the unpaid claims on file in Sacramento constituted some sort of reserve fund in the nature of or as a substitute for a pension or annuity, that some day 'the boys' would appreciate having this fund. Mr. Moore testified that the Controller had said the excess would remain there and the appraisers could draw on it.

"Such assurances as these were admittedly vague and uncertain, and leave much to be desired as far as affirmative proof is concerned. It will hardly be contended that without them Petitioner would have insisted on his legal right. They are advanced here as an excuse for claimant's inaction—his neglect to insist upon his legal rights. After full consideration, this Court is of the opinion they are insufficient to justify the delay; this conduct explains the delay, it does not excuse it.

"The proof here establishes long delay on claimant's part which raises the obvious inference of voluntary relinquishment of his legal rights. Waiver under the law consists of refraining from insisting on some right, claim or privilege. To constitute a waiver there must be a voluntary election by a party to dispense with something of value or forego some advantage he might at his option have insisted upon, with full knowledge, actual or constructive, of its existence. Waiver may be express, or it may be implied, and may result from conduct with respect to the subject matter. (These rules are collected and authorities cited in 51 Cal.Jur.2d pp. 307-315, and in McKinney's Digest, Words and Phrases under 'Waiver', pp. 534-5.)

"It is to be remembered that the fees due from the State and here sued for were minor items dollarwise in comparison with the estate fees. The concept that the unpaid amounts

constituted some sort of reserve from which the appraisers would eventually benefit helps to account for the delay in pressing the claims. However, the conclusion is inescapable that Petitioner found it to his advantage to refrain from claiming all to which the law entitled him, that he, along with all the others in like position, intentionally and willingly and deliberately took that course which amounted to a tacit consent to refrain from demanding their full rights. It is clear from the record that the appraisers voluntarily fell in with the program laid out for them and until their services were terminated had no thought of urging any further rights, and took no step in that direction.''

We turn now to appellant's contention that the authority of the controller under section 14772 is purely ministerial and that he merely performs an auditing function and has no authority or discretion to limit the amount of compensation earned by inheritance tax appraisers but that such authority resides in the superior court alone.

The basic question concerns the meaning of the words ''first approved'' as they are used in section 14772. This is a problem of statutory construction involving the purpose and intent of the Legislature in adopting the particular language used. ■■■ The appraiser serves a dual purpose and in a sense two masters, the court in the administration of the estate and the controller, and, to some extent, the court in the administration of the Inheritance Tax Law. For his services as probate appraiser he is paid out of the estate, his fee being based entirely on the ''total amount of the inventory'' as provided in section 609 of the Probate Code. For his services as inheritance tax appraiser he is paid out of ''inheritance tax money'' such ''reasonable compensation as the superior court of the county, or a judge of that court, shall fix,'' provided that ''[n]o payment shall be made unless a claim for payment is first approved by the Controller.'' It is these latter words, namely, ''first approved by the Controller'' with which we are concerned.

In the case of *Cosner* v. *Board of Supervisors of Colusa County*, 58 Cal. 274, the court said at page 277: ''The word 'approve' is to be considered in connection with the action to which it relates. It does not *ex vi termini* necessarily import the exercise of discretion. Presumptively, however, when the 'approval' of a distinct officer is made necessary to validate or consummate the act of another, it is the intention of the Legislature that he should be invested with the option to

sanction officially or to disapprove the act submitted to him. It involves the idea of discretion and adjudication. Yet such presumed intention is not conclusive, and if it clearly appears from the nature of the act, or the express language of the context, that the word 'approved' is used in a more limited sense, and imposes a mere ministerial or clerical duty, the Courts will so hold. . . .''

The inheritance tax appraisers, as hereinbefore pointed out, are appointed by the controller under the provisions of section 14771 of the Revenue and Taxation Code, and the superior court must appoint one of the designated inheritance tax appraisers to make the appraisement required by the Probate Code. The obvious purpose of this legislation is to insure uniform appraisal practices, to avoid conflicting appraisals and to afford the controller a degree of supervision and control over inheritance tax appraisements. Since he has the right to designate who shall serve as inheritance tax appraisers and a right to terminate that service at his pleasure, he is assured of such control.

Appellant petitioner argues that the controller's right to approve the claim for payment fixed by the superior court under the provisions of section 14772 is limited to an audit; that his sole obligation is to ascertain that all steps leading to the lawful payment ordered by the court have been legally followed; and that having so determined, his duty is to approve the claim which is then paid by the county treasurer from inheritance tax moneys in his possession. In short, appellant argues that the controller is without discretion and that his function is purely ministerial. We do not agree. We believe that the provision that no payment shall be made unless the claim is first approved by the controller means substantially more than a mere requirement that the claim be audited to assure compliance with legal procedures. As we have seen, the controller is charged with the duty of supervising the administration of the inheritance tax laws. He is in a position to and does supervise the appraisers in their activities. He can and does keep informed concerning their income. It would be his desire that such income be sufficiently high to assure the retention of competent personnel and, at the same time, be not so high as to be inconsistent with the duties and responsibilities involved. In this connection it must be kept in mind, as we have seen, that the appraiser has other and far greater income received from and through his duties as probate appraiser, this in addition to

the income received for his work in the administration of the inheritance tax laws.

The case of *First Federal Sav. & Loan Assn. of Hollywood v. State Board of Control,* 53 Cal.App.2d 391 [128 P.2d 75], involved a claim for the refund of certain taxes. The bank and Corporation Franchise Tax Act provided: "If, in the opinion of the commissioner, or the State Board of Equalization, as the case may be, there has been an overpayment of tax, penalty or interest by a taxpayer for any year for any reason, the amount of such overpayment shall be credited against any taxes then due from the taxpayer under this act, and the balance shall be refunded to the taxpayer or its successor through reorganization, merger, or consolidation, or to stockholders upon dissolution. *No such credit or refund shall be allowed or made until approved by the State Board of Control.*"

Petitioner there assumed the same position as does petitioner here, namely, that since his claim for a refund had been allowed by the Board of Equalization it was mandatory upon the State Board of Control to approve such refund, since, according to petitioner, the State Board of Control under the statute was limited to auditing and similar ministerial acts. The court rejected this position stating at page 398:

"The provisions of section 27 of the Bank and Corporation Franchise Tax Act, as above quoted, clearly indicate that the approval of the Board of Control is made necessary to validate the act of the State Board of Equalization in allowing a claim for tax refund. Presumptively, therefore, it was the legislative intent to invest the Board of Control with a power of discretion in the matter; nor does it clearly appear either from the nature of the act or the express language of the context that the word 'approve' is used in a more limited sense. Therefore, in accordance with the rule enunciated in *Cosner* v. *Board of Supervisors of Colusa County, supra,* the presumption must stand that it was the intent of the Legislature to invest the Board of Control with the option to sanction or to disapprove the act submitted to it. The word 'approve' has no technical meaning and the court is without power to extend its meaning beyond that which the 'approved usage of the language' contemplates, unless a contrary or more limited construction 'according to the context' obviously is intended. (Civ. Code, § 13.) . . ."

Applying the rule stated in the foregoing decisions, we believe that it was the intent of the Legislature to invest the

controller with the power of discretion in relation to the compensation of inheritance tax appraisers. We do not believe that when the Legislature said in section 14772 that "[n]o payment shall be made unless the claim for payment is first approved by the Controller" it meant that a claim could be paid without such approval, or that the word "approve" should be interpreted in the limited sense contended for by appellant. It must be borne in mind that the uniform practice for more than 40 years was for the inheritance tax appraiser to present his claim to the controller for approval and that no claim was presented to the superior court for allowance without such approval. The record shows that the inheritance tax appraisers who were all appointed by the controller, and served at his pleasure, all understood that their claims for services as inheritance tax appraisers would not be allowed for amounts in excess of $800 a quarter, or $3,200 a year. Only such claims as were approved by the controller were presented to the superior court for allowance. It was only after the present controller took office in January 1959 and terminated the services of appellant and many other inheritance tax appraisers that appellant presented the claims involved in the case at bench to the superior court without the approval of the controller.

 It is a cardinal rule of statutory construction that a statute should, if possible, be given an interpretation which will give effect to the legislative intent and which is consistent with the real object and purpose of the statute. As stated in the case of *Select Base Materials, Inc.* v. *Board of Equalization,* 51 Cal.2d 640 [335 P.2d 672], at page 645:

"The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*California Toll Bridge Authority* v. *Kuchel,* 40 Cal.2d 43, 53 [251 P.2d 4] ; *County of Alameda* v. *Kuchel,* 32 Cal.2d 193, 199 [195 P.2d 17] ; *Dickey* v. *Raisin Proration Zone No. 1,* 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324] ; 82 C.J.S., Statutes, § 321, p. 560; 45 Cal.Jur.2d, Statutes, § 126, p. 634.) Moreover, 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' (*Stafford* v. *Los Angeles etc. Retirement Board,* 42 Cal.2d 795, 799 [270 P.2d 12].) If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. (*People* v. *Western Air Lines, Inc.,* 42 Cal.2d 621, 638 [268

P.2d 723].) Such purpose will not be sacrificed to a literal construction of any part of the act. *(People* v. *Ventura Refining Co.,* 204 Cal. 286, 292 [268 P. 347, 283 P. 60]; *H. S. Mann Corp.* v. *Moody,* 144 Cal.App.2d 310, 320 [301 P.2d 28]; 45 Cal.Jur.2d, Statutes, § 130, p. 637.) ..."

It is also a rule of statutory construction that the interpretation of a statute by those charged with the responsibility of its execution is entitled to great weight. This rule is well stated in *Paramount Citrus Assn.* v. *Jacobsen,* 162 Cal.App.2d 147 [328 P.2d 14], at page 153:

 "The rule is well settled that ' " [T]he contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such interpretation unless it is clearly erroneous or unauthorized." ' *(Richfield Oil Corp.* v. *Crawford* (1952) 39 Cal.2d 729, 736 [249 P.2d 600].)"

From the beginning the controller exercised the authority to limit the income of inheritance tax appraisers from inheritance tax appraisals. The evidence is that a limit of $3,000 per inheritance tax year was placed on appraisers as early as 1923 and that the limit was raised to approximately $3,200 in 1928 or 1929, with some individual exceptions. Furthermore, from the first, appraisers were required to submit their claims to the controller's office before presenting those claims which were approved to the courts and to the county treasurers.

 In other words, the first controller who was serving contemporaneously with the legislative enactment exercised authority to limit compensation of appraisers and established the system which has been followed ever since by each succeeding controller. Until the present suit the administrative construction has not been challenged or changed materially. The Inheritance Tax Law has been repealed and reenacted without change in this regard in 1921 (Stats. 1921, ch. 821, p. 1500) and in 1935 (Stats. 1935, ch. 358, p. 1266).

It can probably be said that no policy in the administration of state government in California has been accepted with less question or controversy for a longer period of time. We do not believe that the administrative interpretation and construction accorded by all controllers, without exception, and accepted by all appraisers without question for a period of 40 years can be held to be clearly erroneous.

 Appellant makes the further contention that even if

the controller had authority to limit compensation of appraisers under section 14772, the limit of $3,200 was unreasonable. No evidence was introduced by the appellant as to what a reasonable amount would be. Certainly the limit is reasonable as to those counties wherein the appraisers do not file claims sufficient to reach it. On the other hand, it is perfectly reasonable for the controller to look at the income of appraisers in the larger counties which is received for the appraisal of estates in probate under section 609 of the Probate Code. In this connection this respondent procured the affidavits of several appraisers from the four metropolitan counties which are a part of the record and indicate an average net income during the years 1956, 1957, and 1958 of over $20,000 per annum. Only the inheritance tax appraisers in the larger counties have the opportunity to gain such income because of the numerous estates of large value subject to probate in those counties. Furthermore, it is by virtue of their appointment as inheritance tax appraisers under section 14772 that they are able to act as appraisers of estates in probate under section 605 of the Probate Code. Consequently, it seems entirely reasonable that the controller in determining a proper limitation could look at the number of appraisers, the size of the counties, the disparity in income from appraising between large and small counties, and the basic fact that appraisers derive two fees from one appraisal.

Perhaps the most fundamental factor in the controller's considerations is the cost of administration of the system of inheritance tax collection that he is required to supervise. Mr. Hickey testified that approximately $500,000 of unapproved claims accumulated in each of the fiscal years 1957-1958 and 1958-1959 and $108,748 for the first quarter of the fiscal year 1959-1960. He also testified that a total of $187,-968.56 in claims was approved during the fiscal year 1957-1958; in the fiscal year 1958-1959 a total of $194,257.92 in claims was approved; and for the first quarter of the fiscal year 1959-1960 the sum of $31,511.84 in claims was approved. On a rough approximation, if appellant were correct in his theory, the cost for appraisals during the last few years would have been around $600,000 to $700,000 a year. This estimate is the fee for appraisals and tax determinations alone and does not include the other costs of administration. Again, it should be noted that the bulk of these fees would be received by appraisers only in the larger counties since in 33 counties appraisers never reached the $3,200 limitation. This

system, if appellant is correct, would not only be very costly, it would be extremely inequitable. We do not believe that if the controller has discretion under section 14772 it can be held that the limitation he has imposed is unreasonable as a matter of law.

Appellant places great reliance on the early case of *McCauley* v. *Brooks*, 16 Cal. 11, which dealt with the general duties of the controller, which, as pointed out in the *McCauley* case, are in the main ministerial. The cited case is clearly distinguishable from the case at bench in which we are concerned with the interpretation of a special statute, to wit, the Inheritance Tax Law, under which special duties are conferred upon the State Controller which are discretionary.

In summary, we hold (1) that the trial court's conclusion that appellant's failure to make any claim in excess of the maximum compensation approved by the controller during the years in which he was an inheritance tax appraiser constituted a waiver of any right to compensation is sustained by the evidence and the law; (2) that the controller was invested with the power of discretion in relation to the compensation of inheritance tax appraisers, and the fixing of a maximum compensation of $3,200 a year for an inheritance tax appraiser was not an unreasonable exercise of such discretion.

No other points require discussion.

The judgment is affirmed.

Pierce, P. J., and Van Dyke J.,* concurred.

A petition for a rehearing was denied April 23, 1963, and appellant's petition for a hearing by the Supreme Court was denied May 22, 1963.

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.